UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 JAN 22 PM 10: 01

LORETTA G. WHYTE
CLERK

BARBARA ANN SCOTT PITRE,
A/K/A BARBARA ANN SCOTT
VS.
DEPUTY SHERIFF KIRK RODRIGUE,
DEPUTY SHERIFF J. PATRICK DeGRAVELLES,
DEPUTY SHERIFF JULES TARULLO AND
SHERIFF CRAIG WEBRE,
PARISH OF LaFOURCHE
STATE OF LOUISIANA

CIVIL ACTION

NUMBER: 00-118

SECTION: "K"

MAG. NUMBER: 5

## PRE-TRIAL MEMORANDUM

**NOW INTO COURT**, through undersigned counsel, comes plaintiff, **BARBARA ANN SCOTT PITRE ("SCOTT")** who submits the following Pre-Trial Memorandum on the issues of qualified immunity, damages and quantum in the above captioned matter. For reasons set forth fully in the attached Memorandum, plaintiff requests this Honorable Court grant Judgment in her favor.

Respectfully submitted,

FAVRET, DEMAREST, RUSSO & LUTKEWITTE
A Professional Law Corporation

J. PAUL DEMAREST, No. 4855
ELIA DIAZ-YAEGER, No. 24635
1515 Poydras Street, Suite 1400
New Orleans, Louisiana 70112
Telephone: (504) 561-1006
Facsimile: (504) 523-0699


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BARBARA ANN SCOTT PITRE,          CIVIL ACTION
A/K/A BARBARA ANN SCOTT
VS.                                      NUMBER: 00-118
DEPUTY SHERIFF KIRK RODRIGUE,
DEPUTY SHERIFF J. PATRICK DeGRAVELLES,    SECTION: "K"
DEPUTY SHERIFF JULES TARULLO AND
SHERIFF CRAIG WEBRE,                MAG. NUMBER: 5
PARISH OF LaFOURCHE
STATE OF LOUISIANA

## PRE-TRIAL MEMORANDUM REGARDING
## QUALIFIED IMMUNITY, DAMAGES AND QUANTUM

Plaintiff, **BARBARA ANN SCOTT PITRE ("SCOTT")**, submits the following memorandum on her behalf of the above captioned matter.

Barbara Ann Scott brings these actions pursuant to Title 42 USCA § 1984 and Title 28 USCA § 1343(3). Specifically, on January 14, 1999, in Thibodaux, Louisiana, Ms. Scott was falsely arrested and physically assaulted by the defendants, Deputy Sheriff Kirk Rodrigue, Deputy Sheriff J.P. DeGravelles, Deputy Sheriff Jules Tarullo and Sheriff Craig Webre, all while in the course and scope of their employment with the Sheriff's Department for the Parish of Lafourche.

Ms. Scott was arrested at her residence at 709 Highway 307 in Thibodaux, Louisiana when the above named deputies forced their way into her home, arrested her on an alleged charge of violating a protective order, pursuant to La. Revised Statute 70:1479, which was totally fabricated and false in that the defendants had absolutely no reason to arrest and incarcerate her.

Plaintiff further contends that the defendants herein acted in concert with each other, and singularly did physically and verbally assault her, caused her to be stripped searched while incarcerated, and physically and mentally abused her while in their control, all of which while acting under the color of state law and in violation of the Constitutional Rights as a citizen of the United

States of America. Moreover, Ms. Scott was incarcerated for several hours, physically abused, injured and assaulted, causing her injuries to her entire spine, mental injuries and damages, all in depravation of her rights, privileges and amenities guaranteed her as a citizen of the United States by the United States Constitution.

Plaintiff also brings a claim against the defendants under the Louisiana state law and Louisiana Civil Code Article 2315 for the actions of the defendants described herein, as well as against Sheriff Craig Webre in his capacity as employer of the defendants, Rodrigue, DeGravelles and Tarullo, for their actions arising under their employment with the defendant, Sheriff Craig Webre, and for all damages that may be granted to the plaintiff under Louisiana state law.

As of date, Ms. Scott continues to suffer from the physical and mental injuries received as a result of the incident which occurred on January 14, 1999. Moreover, she continues to be fearful for her physical safety and continues to be fearful of police officers in general.

## I.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Government officials are entitled to qualified immunity insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Accordingly, when an official asserts the defense of qualified immunity, the court must decide whether the defendant's conduct was objectively reasonable in the context of the clearly established rules at the time of the incident. Spann v. Rainey, 987 So.2d 1110, 1114 (1983); Jones v. City of Jackson, et al, 203 F.3d 873, 879 (5 Cir. 2000). Moreover, in suits alleging illegal or false arrest, the qualified immunity termination turns on whether a reasonable officer could have believed the arrest to be lawful in light of clearly established law and the information the officer possessed. Gibson, 44 So.2d at 277 (5 Cir. 1998). Thus, qualified immunity *cannot* succeed where it is obvious that a reasonably competent officer would find no

2

probable cause. <u>Malley v. Briggs</u>, 475 U.S. 335, 341; 106 S.Ct. 1092, 1096; 89 L.Ed.2d 271, 278 (1986). Finally, when an officer's conduct violates clearly established laws, his qualified immunity defense must ordinarily fail despite his good faith believed to the contrary because, the reasonably competent public official should have known the law governing his conduct. <u>Babb v. Dorman</u>, 33 F.3d 472.

As the Supreme Court reiterated in <u>Winston v. Lee</u>, 470 U.S. 753, 758-760; 105 S.Ct. 1611, 1615-16; 84 L.Ed.2d 652 (1995), "the overriding function of the Fourth Amendment is to protect personal privacy and dignity against an unwarranted intrusion by the State." The values of individual privacy and dignity are "basic to a free society," and the Fourth Amendment protects these values by recognizing the "individual's legitimate expectations that in certain places and at certain times he or she has the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." The Amendment explicitly protects against a seizure of a person when the government meaningfully interferes with their liberty. <u>United States v. Jacobsen</u>, 466 U.S. at 113; 104 S.Ct. at 1656; <u>National Treasury Employees Union v. Raab</u>, 816 F.2d at 175.

When governmental officials abuse their offices, "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees." <u>Anderson v. Creighton</u>, 483 U.S. 635, 638; 107 S.Ct. 3034, 3038; 97 L.Ed.2d 523 (1987); <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 814; 102 S.Ct. 2727, 2736; 73 L.Ed.2d 396 (1982). In <u>Harlow v. Fitzgerald</u>, 457 U.S. at 815-19; 102 S.Ct. at 2736-39, the court established a two-part test under which a public official may claim that his conduct is protected by qualified immunity. First, the court must look to the currently applicable law and determine whether the law was clearly established at the time the action in question occurred. If the court determines that the law was clearly established at the time the action occurred, then the public official claiming immunity must show that, because of extraordinary circumstances, he neither knew

3

nor should have known of the relevant legal standard. See: <u>Moresi v. State, Department of Wildlife</u> <u>and Fisheries</u>, 567 So.2d at 1084-85; <u>Kyle v. Civil Service Commission</u>, 588 So.2d at 1159-60. In <u>Anderson v. Creighton</u>, 483 U.S. at 639; 107 S.Ct. at 3038, the Supreme Court held that the question of whether a defendant asserting qualified immunity may be personally liable turns on the objective legal reasonableness of the defendant's actions assessed in light of clearly established law. <u>Lewis v.</u> <u>Goodie</u>, 798 F.Supp. 382, 390 (W.D.La.1992). Thus, if a defendant's conduct actually violated a plaintiff's Constitutional Rights, the defendant is entitled to qualified immunity only if the conduct was objectively reasonable. <u>Pfannstiel v. City of</u> 95 0787 (La.App. 1 Cir. 6/28/96); 687 So.2d 1013, <u>Marion</u>, 918 F.2d 1178, 1183 (5 Cir.1990); <u>Lewis v. Goodie</u>, 798 F.Supp. at 390.

In this case, neither party disputes that the plaintiff has alleged a violation of the clearly establish right, as their could be no doubt that Ms. Scott had a clearly established right to be free from: (1) arrest without probable cause; (2) arrest without a warrant; (3) the deputies entering her home without consent; and (4) an arrest through use of excessive force.

Applying the principles of qualified immunity, the relevant question therefore is whether the deputies' actions in entering Scott's residence without consent, physically and violently abusing her, and placing her under an arrest, all without warrant violated "clearly established statutory or Constitutional Rights of which a reasonable person would have known, and whether the deputies conduct was objectively reasonable."

**A.     The deputies did not have probable cause, a warrant or consent to enter plaintiff's home and therefore the arrest of Ms. Scott was in violation of her constitutional rights.**

In the instant matter, plaintiff was arrested and booked for violation of Louisiana Revised Statute 14:79 (violation of a protective order) based on a court order entitled <u>Barbara Legendre v.</u> <u>Alvin Legendre</u>, assigned No. 84602, issued by the 17th Judicial District Court, Division "D" relative

to a domestic proceeding. However, the facts show that Ms. Scott *was not* subject to this "protection" order, additionally that a "protective order" had not been issued. Rather, in that domestic proceeding involving the divorce and a community property partition, a temporary restraining order was in effect. This restraining order was directed to both Alvin Legendre and Barbara Legendre. In domestic proceedings, issuance of a temporary restraining order/injunctions as they pertain to *the parties* and community property are a normal course of action and deputy sheriffs in their day-to-day dealings and training are well-versed with the nature, application, boundaries, and affects of temporary restraining orders.

The purpose of an injunction is not to afford a remedy for what has happened in the past, but to prevent their occurrence of acts in the future which are unlawful or interest. <u>Louisiana Live Stock Sanitary Bd. v. Prather</u>, 301 So.2d 688 (La.App. 3 Cir. 1974). Louisiana Civil Code of Procedure Article 3601 authorizes a court to issue a temporary restraining order during the pendency of an action for an injunction. Thus, the temporary restraining order is ancillary to the action for an injunction. Further, Art. 3611 provides that the disobedience of, or resistance to, a temporary restraining order is *punishable by contempt of court.* Hence, it is clear that the proper remedy for an aggrieved party asserting a violation of court order is to petition the court for enforcement of the order. However, it is imperative to note that this remedy is only available to the parties that are bound by the temporary restraining order.

The alleged protection order which the deputies based their unwarranted and illegal arrest of Ms. Scott on was issued by the court in connection with a domestic proceeding between Ms. Scott's boyfriend, Alvin Legendre and his ex-wife, Barbara Legendre. Ms. Scott was *never served with a writ of injunction, nor did she have notice of the injunction, nor was a court appearance ever had on her behalf in regard to same.*

5

Defendants argue that they arrested Barbara Scott in compliance with Civil Code Art. Procedure 23(3)3 which provides that a police officer may without a warrant arrest a person when:

> (3) the police officer has reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer.

It is undisputed that deputies in their normal course of duty should be familiar with the language contained in a temporary restraining order as well as in a properly issued domestic abuse protective order. With a domestic abuse protective order, as well as in all temporary restraining orders, jurisprudence and the legislature has held that for the order to be effective, it must be properly issued and notice must be served. It is incomprehensible that deputies in their normal course of duties, especially dealing in domestic matters, would not know to whom and how an order is effective. It is undisputed that deputies are well versed and extremely familiar with the fact that within a domestic proceeding a third party (*not a party to the matter*) is not subject to a restraining order. Moreover, neither statute mandates an arrest, however, by the plain language of the statute the police officers are only authorized to arrest an individual if they are subject to the restraining order, properly issued and served notice upon.

In this instance, Ms. Scott was not a party to the domestic proceeding, nor was she given notice of the temporary restraining order by service of process, which is required by law. Ms. Scott was never served with the writ of injunction. And finally, Ms. Scott nor her counsel ever made an appearance on her behalf in regard to a restraining order made in connection with a domestic proceeding between Ms. Scott's boyfriend, Alvin Legendre, and his ex-wife, Barbara Legendre. Accordingly, the deputies should have known, particularly, taking into account their knowledge of facts and circumstances, that their conduct would result in the unlawful arrest of Ms. Scott.

On the evening of January 14, 1999, the deputies entered into Ms. Scott's residence without consent, without a warrant, and without probable cause; placed her under arrest for violation of a protective order which was issued in a proceeding that she was not a party to nor had she received notice of or was served with this protective order. Accordingly, the deputies' actions constitute a classic, Fourth Amendment violation.

An arrest for a misdemeanor not committed in the presence of the officer arresting should not be made without an affidavit and warrant, and, where this is done without a significant inquiry as to the guilt of the party arrested, the person or corporation responsible for the arrest is liable in damages. Pearson v. Great Southern Lumber Company, Sup. 1913, 134 La. 117, 63 So. 759.

It is well established that the Fourth Amendment generally prohibits warrantless entry of a persons home, whether to make an arrest or to search for specific objects. Ellen v. Rodriguez, 497 U.S. 177, 181; 110 S.Ct. 22793, 2797; 111 L.ED. 2d 148 (1990) (Payton v. New York, 445 U.S. 573; 100 S.Ct. 1371; 63 L.Ed.2d 639 (1980)); Johnson v. United States, 333 U.S. 10; 68 S.Ct. 367; 92 L.Ed. 436 (1948). See also: United States v. Deutsch, 987 F. 2d 878, 883 (2 Cir. 1993); (United States v. Campbell, 581 F. 2d 22, 25 (2 Cir. 1978)) (In the absence of exigent circumstances, warrantless entry of law enforcement officers into the private home of a suspect for the purpose of making an arrest is barred by the Fourth Amendment). The rule prohibiting warrantless entries into home applies even if there is probable cause to arrest the suspect. Minnesota v. Olson, 495 U.S. 91, 95; 110 S. Ct. 1684, 1687; 109 L.Ed.2d 85 (1990). Thus, when government authorities enter a person's home, the warrant requirement imposed by the Fourth Amendment will only yield when "extingent circumstances require law enforcement officers to act without delay." United States v. Zuber, 899 F.Supp. 188 (1985) citing United States v. Gordils, 982 F.2d 64, 69 (2 Cir. 1992), cert. denied. 507 U.S. 1054; 113 S.Ct. 1953; 123 L.Ed.2d 657 (1993)



Reasonable cause to arrest without warrant is equivalent of probable cause to obtain an arrest warrant. State v. Powell, App. 2 Cir. 1992, 598 So.2d 454, writ denied, 657 So.2d 1089. Additionally, the strength of the requisite probable cause for an arrest varies with the magnitude of the intrusion and the alternative available to the officer. State v. Billiott, Sup. 1979; 370 So.2d 539, certiorari denied, 100 S.Ct. 284; 444 U.S. 935; 62 L.Ed.2d 194.

In determining whether there has been compliance with the standards governing probable cause for arrest without a warrant, the setting in which the arrest took place becomes a factor of primary importance, and facts and circumstances known to the arresting officers from which they might draw conclusions warranted by their training and experience will become the focus of the court's attention with due allowance for discretion vested in the trial court. State v. Hopper, Sup. 1967; 251 La. 77; 203 So.2d 222, vacated 88 S.Ct. 2281; 392 U.S. 658; 20 L.Ed.2d 1347, on remand 253 La. 439; 218 So.2d 551.

The warrantless entry rule articulated by the Supreme Court in Peyton is premised on the fact that "physical entry of the home is the chief evil against which the wording of the 4th Amendment is directed ". Peyton, 445 U.S. App. 585-86; 100 S.Ct. at 1379-80 (quoting United States  v. United States District Court, 407 U.S. 297, 313; 92 S.Ct. 2125, 2134; 32 L.Ed.2d 752 (1972)). As the Court noted in Peyton the protection afforded by the Fourth Amendment embodied the "overriding respect for the sanctity of the home that has been embodied in our tradition since the origin of the Republic. Peyton, at 106. Thus, warrantless entries by government agents into individual's homes for the purpose of search or arrest are presumably unreasonable. United States v. Accosta, 965 F.2d 1248, 1251 (3 Cir. 1992). Accordingly, the warrantless arrest of Scott is in plain violation of her Fourth and Fourteenth Amendment Rights.

8



If the government seeks to rely on the exception commonly known as exigent circumstances "it bears the burden of establishing by a preponderance of evidence that its entry into the defendant's apartment was justified by such circumstances." See: <u>Peyton v. New York</u>, 445 U.S. 573, 590; 100 S.Ct. 1371, 1382; 63 L.Ed.2d 639 (1980). This would apply in cases in which the inevitable delay incident to obtaining a warrant must give way to an "urgent need for immediate action." <u>United States v. Morgan</u>, 743 F.2d 1158, 1169 (6 Cir. 1984) <u>cert denied</u> 471 U.S. 1061; 105 S.Ct. 2126; 85 L.Ed.2d 490 (1985). Additional recognized circumstances include hot pursuit of a suspect into his home, the risk of destruction of evidence, potential escape of suspects, and threats of physical harm to law enforcement officers or other innocent individuals. See: <u>United States v. Velasquez</u>, 626 F.2d 314, 317 (3 Cir. 1980). Finally, a warrantless in-home arrest is valid when consent is given for the officer's to enter the home.

The test for determining whether consent to entry is valid is whether the consent was given voluntarily and without coercion. <u>United States v. Denis</u>, 625 F.2d 782, 793, (8 Cir. 1980). This is a question of fact to be determined from all circumstances. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218; 227; 93 S.Ct. 2041, 2047-2048. Moreover, it is clear that the burden is on the government to show that the consent was freely given. <u>Bumper v. North Carolina</u>, 391 U.S. 543, 548; 88 S.Ct. 1788, 1791-1792; 20 L.Ed.2d 797, (1968).

The deputies allege that they affected the arrest outside of the home, when Scott stepped outside of her house. However, petitioner, Mr. Alvin Legrende, and Mr. Melvin Legrende all allege that the arrest of Scott occurred *inside* her home. At no time have the deputies alleged that they had "consent" to enter the plaintiff's home.

In the instant matter the deputies arrested Ms. Scott without a warrant, in her residence, without consent into her home, absent any exigent circumstances as probable cause to affect that arrest.

9



Accordingly, the deputies' actions constitute a classic Fourth Amendment violation; they made a decision to arrest an individual "Scott" without an arrest warrant for her and absent any circumstances that a reasonable deputy would justify such an arrest.

**B.      The deputies violated Ms. Scott's constitutional rights by using excess force when placing her under arrest.**

In the instant matter, the deputies unlawfully and without consent entered the plaintiff's residence. Ms. Scott when hearing the commotion, approached the deputies - wherein they informed her that she was under arrest. Ms. Scott began to weep and informed the officers that she was going to the bathroom to change her clothes, at which time the three deputies grabbed Ms. Scott and shoved her into the doorjamb, lifting her feet off the floor, one of the deputies grabbed her by the neck, shoving her head against the wall, effecting a choke hold on her. Ms. Scott could not breath. Shortly thereafter, the deputies, without warning, dropped Ms. Scott causing her to fall to the floor, landing on her buttocks with one foot curled under her.

The Supreme Court has held that deputies should not use a "choke hold" wherein the pressure is applied to the front of the subject's neck which can be effectuated with a baton, forearm or hand. The court noticed that this is not proper police procedure and that this type of hold should not be used since it will interfere with the subject's breathing, possibly crushing their larynx and/or choking the subject. Moreover, the court has found that this procedure is not proper and could only be considered a reasonable police procedure if the officer is in danger of death or grievous bodily hard. Tennessee v. Garner, 471 U.S. 1, 12; 105 S.Ct. 1694, 1701-02; 85 L.Ed. 2d 1 (1985). (Holding that "where the subject poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so").

Whether use of force in executing a search and seizure is excessive and in violation of the Fourth Amendment is determined by a number of factors such as the severity of the crime, whether the

suspect poses an immediate threat, and whether the suspect is resisting or fleeing. U.S. Constitution Amendment 4; Post v. City of Fort Lauderdale, 7 So.3 1552, 1559 (11 Cir. 1993). Accordingly, in addressing an excessive force claim brought under § 1983, the analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force. Graham v. Connor, 490 U.S. 386, 394; 109 S.Ct. 1865, 1870; 104 L.Ed.2d 443 (1989). In Graham, the Supreme Court held that: [A]11 Claims that law enforcement officers who used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other credit seizure of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an exclusive textual source of constitutional protection... that amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims. Id. at 395; 109 S.Ct. at 1871.

At the time that Ms. Scott was "seized," it was clear that the Fourth Amendment provided an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct. In order to determine whether the defendants are shielded from Ms. Scott's allegations of excessive force, the court must determine "whether the officer[s'] actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. Id., at 397; 106 S.Ct. at 1872. In making this determination, the court should consider the facts and circumstances of each particular case. Id.

In the instant matter, Ms. Scott was arrested in clear violation of the law. Moreover, she was arrested for a proported violation of a protection order, which a deputy in his normal course and scope of employment and knowledge pertaining to his duties would have and should have known did not apply to her. Moreover, Ms. Scott did not pose an immediate threat to either the officers or Ms. Legendre. Ms. Scott was not resisting the arrest nor was she fleeing. Accordingly, the officers' claims

of qualified immunity should necessarily fail as a reasonable officer in the defendant's position would conclude that the force was unlawful.

**C.     The deputies' actions resulted in the tort of false arrest being committed against Ms. Scott.**

Jurisprudence has held that a physical attack on a private citizen by a police officer, *absent a valid arrest*, constitutes a battery.  Norrell v. City of Monroe, 375 So.2d 159 (La.App. 2 Cir. 1979); Mallone v. Fields, 335 S.2d 538 (La.App. 2 Cir. 1976).

Pursuant to Louisiana law, the deputies' actions resulted in the tort of false arrest being committed against Ms. Scott.  Pursuant to Louisiana law, the tort of false arrest has two essential elements: 1) detention of the person; and 2) the unlawfulness of such detention.  Mills v. Mabile, 1996 WL 3942 at 4 (ED La.) Touchton v. Crougher Company, 512 So.2d 520, 524 (La. App. 3 Cir. 1987).  Moreover, it is important to note that damages to an individual for injuries or losses caused by a violation of LSA-Const. Art. 1, § 5, are recoverable.   Moresi v. State, Department of Wildlife and Fisheries, 567 So.2d 1081, 1093 (La.1990).

The Louisiana Constitution affords a higher standard of individual liberty than the Fourth Amendment of the United States Constitution because Article 1, § 5 of the Louisiana Constitution protects citizens against an "invasion of privacy."  State v. Matthews, 94-2122 p. 3 (La. App. 4 Cir. 4/26/95); 654 So.2d 868, 870; State v. Thomas, 94-42 p.4 (La.App. 5 Cir. 5/31/94); 638 So.2d 440, 443; writ denied; 94-1695 (La. 11/17/95); 663 So.2d 718.  In the area of invasion of privacy by unreasonable searches and seizures, the courts have continuously interpreted the right of privacy to afford a broader and even more stringent protection of individual liberty than the Fourth Amendment. State v. Perry, 610 So.2d 746, 755-56 (La.1992).   See also; Holthus v. Louisiana State Racing Commission, 580 So.2d 469, 471 (La. App. 4 Cir.1991), writ denied; 584 So.2d 1162 (La.1991).



Accordingly, given that the state constitutional right to privacy is broader than the federal constitutional right against unreasonable searches and seizures, in violating the more lenient protection, the deputies would also have violated the more stringent protection. As a result, in addition to violating Scott's federal constitutional guarantees against unreasonable seizures, the deputies also violated Scott's state constitutional rights against invasion of her privacy under LSA-Const. Art. 1, § 5.

### D.    The defendants violated Ms. Scott's constitutional rights by performing an unlawful strip search.

Jurisprudence has been consistent in holding that the Fourth Amendment precludes prison officials from performing strip/cavity searches of arrestees charged with misdemeanors and other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, particularly, characteristics of the arrestee and/or the circumstances of the arrest. Mary Beth G. v. City of Chicago, 723; F.2d 1263 (7 Cir. 1983); Doe v. Renfrow, 631 F.2d (7 Cir. 1880) (per curiam); Hill v. Bogans, 735 F.2d 391 (10 Cir. 1984); Logan v. Shealy; 660 F.2d 1007, 1013 (4 Cir. 1981); Kraushaar v. Flanigan, 45 F.3d 1040 (7 Cir. 1995); 200 WWL 1154641 (N.D.III); Leinen v. City of Elgin, (Aug 15, 2000); Hunt v. Polk County, 551 D. Sup. 339 (SD Iowa, Nov. 12, 1982); Weber v. Dell, 804 F.2d 796 (2d Cir. 1986).

Although probable cause is the accepted standard, however, even under the reasonable suspicion standard, jail officials "must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience... inchoate, unspecified suspicions are not enough, the suspicion must be individualized, i.e. specific to the person who is targeted for the strip search. Hunter v. Auger, 672 F.2d 668 (8 Cir. 1982). The more intrusive the search, the closer governmental authorities must come to demonstrating probable cause for believing that the search will uncover objects for which the search is being conducted. Doe, at 1219. Moreover, strip searches for

weapons or contraband violate the Fourth Amendment if the detainee was not arrested for reasonable grounds to believe that she had committed an offense related to the nature of the items being searched for. Doe, at 1220.

In the instant matter, Ms. Scott was unlawfully arrested and submitted to an illegal strip search which was conducted in plain view of other officers. Ms. Scott was charged with a misdemeanor. Moreover, the deputies did not have a reasonable suspicion that she was carrying a weapon or other type of contraband based on the crime charged. Accordingly, the strip search was in clear violation of Ms. Scott's Fourth Amendment rights.

Defendant, Sheriff Craig Webre, has asserted a good faith immunity defense. However, given the jurisprudence, his good faith immunity defense must fail. The jurisprudence has found that a sheriff can be held liable if the sheriff promulgated the unconstitutional jail policy authorizing strip searches to arrestees regardless of whether they were reasonably suspected of concealing contraband. Weber v. Sell, 804 F.2d 796 (2 Cir. 1986); Pembaur v. City of Cincinnati -- U.S.--, 106, S.Ct. 1292; 89 L.Ed. 452 (1986); Blackburn v. Snow, 771 F.2d 556, 571 (1 Cir. 1985); Jones v. Edwards, 770 F.2d 739, 742 n.4 (8 Cir. 1985).

Finally, the test for liability then is whether the decision to subject an arrestees to strip search without regard to the specific characteristics of the arrestees or the nature of the crimes with which they are charged "may fairly be said to represent official policy." Monell v. Department of Social Services, 436 U.S. 658; 98 S.Ct. 2018; 56 L.Ed. 2d 611 (1978). Accordingly, Sheriff Craig Webre should likewise be held liable for violating Ms. Scott's Fourth Amendment rights in allowing the strip search to occur.

E.    **Deputy Sheriff Criag Webre should be held vicarious liability for the tortuous and unlawful actions of his deputies.**

14

Louisiana jurisprudence has held that a sheriff in his official capacity as an employer of his deputy is liable for the deputy's torts committed in the course and scope of his employment. Genkins v. Jefferson Parish Sheriff's Office, 402 So.2d 659. See also: Revised Statute 42:1441. Accordingly, if the deputies are held to be in a violation of a State law claim for false arrest and assault and battery, then their employer, Sheriff Craig Webre, can likewise be held liable for the deputies' unlawful actions in the State law claim. See also: Nall v. Parish of Iberville, App. 1 Cir., 1989; 542 So.2d 145; Sullivan v. Quick, App. 3 Cir. 1981; 406 So.2d 1984.

In this instance, it is clear that the deputies committed an assault and battery on Ms. Scott, as she was placed under false arrest pursuant to Louisiana law. Accordingly, Sheriff Craig Webre should likewise be held liable for the deputies' torts which were committed against Ms. Smith.

## II.  **MEDICAL SUMMARY**

Ms. Scott first sought medical treatment with Dr. Joseph Palotta on May 14, 1999, wherein she described the events of the night of January 14, 1999, and cried throughout the interview. She relayed to the doctor that she has been unable to sleep at night, having flashbacks and nightmares, usually talking and crying in her sleep, waking up with anxiety and headaches. Since the arrest she has been experiencing depression, anxiety, insomnia and crying about. Moreover, she has been short-tempered and has lost interest and pleasure in things and fears leaving her home, thus hiding in her house. Dr. Palotta's diagnosis was post-traumatic stress disorder and major depressive disorder. His recommendation was psychotherapy.

Thereafter, Ms. Scott sought treatment on June 30, 1999, with Dr. Bradley Bartholomew. He evaluated her neck and back problems. Ms. Scott noticed back and neck problems approximately one week following her arrest. She has complained of a consistent burning pain, starting in the neck and going all the way down to her lower back and tailbone area. The exam revealed her to be very tender

15



in the cervical and lumbar area.   Dr. Bartholomew recommended physical therapy, along with Neurontin and Robaxin.

On July 1, 1999, she again saw Dr. Palotta.  At that time she was still experiencing depression and anxiety; moreover, she was still suffering from nightmares.  She was also complaining of a loss of sexual interest since the arrest.  On July 9, 1999, she was seen at the Terrebonne General Medical Center Emergency Room complaining of spinal pain.   On July 14, 1999, she again saw Dr. Bartholomew complaining of severe pain as the Neurontin and Robaxin was not providing any relief. He recommended a cervical and lumbar MRI.  On July 20, 1999, an MRI of both the lumbar spine and cervical spine was conducted.  Thereafter she was seen by Dr. Palotta on July 29, 1999, where she complained of continued depression, anxiety and nightmares.  Dr. Palotta prescribed Effexor and Trazadone.   On July 30, 1999, Dr. Bartholomew again saw Ms. Scott.   At that time she was complaining of a shocking sensation in her neck and back.  His impression was  of a soft tissue sprain and continued therapy.

From  August  13,  1999  until  September  20,  1999,  Ms.  Scott  received  physical  therapy treatments for generalized pain and cervical thoracic and lumbar spine.  She complained of consistent burning and shocking sensations in occipital, cervical and lumbar areas.   She also had frontal headaches.  She initially rated the pain as a "7" out of "10" and reported no improvement with therapy. Physical therapy continued through October 15, 1999.  Treatment consisted of moist heat, ultrasound and therapeutic exercise.  She continued to experience pain after therapy and was given a home exercise program.

Ms. Scott continued psychiatric treatment with Dr. Palotta through December, 2000, and reported that eighty to eighty-five (80-85%) percent of her depression and anxiety has remained.  She continues to be depressed regarding her alienation and is afraid to go outside because of a fear of the

Sheriff's Department.  Her psychotherapy is supportive at cognitive in nature and she continues her medications of Effexor, Trazadone, Valium, and Wellburtrin.

Ms. Scott saw Dr. Bartholomew on January 14, 2000, complaining of neck and back pain and was not having relief with Aleve or Tylenol.  The exam revealed the bilateral paravertebral tenderness in both cervical and lumbar areas over the facets.  No spasm.  He recommended that she see Dr. Charles Aprill for facet blocks.

On July 17, 2000, Ms. Scott saw Dr. Aprill and received a lumbar facet injection at L3-4 left, L4-5 bilaterally, L5-S1 bilaterally.  On August 3, 2000, she again saw Dr. Bartholomew and stated that she was not receiving relief from the facet block.  She continued complaining of neck and back pain and was now experiencing electrical pain down to both knees in anterior and posterior aspects, as well as an occasional loss of balance.  The exam revealed bilateral paravertebral tenderness and Dr. Bartholomew discussed a pain management program and referred Ms. Scott to Dr. Robert Irwin at the LSU Physical Medicine and Rehab Kenner Spine Center.  Dr. Bartholomew released Ms. Scott at this time.

On October 3, 2000, Ms. Scott saw Dr. Irwin.  She was evaluated for chronic pain.  The diagnosis revealed depression was a major player in this scenario.  He prescribed Buspar and counseling to address the issues; there was myofascial pain, not fibromyalgia.  She needed to comply with the home exercise program, and finally, a sacral-iliac joint dysfunction.

As of date, Ms. Scott has incurred medical bills in the amount of $11,749.46.

### III.  DAMAGES/QUANTUM

Garrett v. Fleetwood, 93-2382 (La. App. 4 Cir. 9/29/94); 644 So.2d 664.  General damages were awarded in the amount of $140,000.00, which included damages for physical pain and suffering, mental anguish and loss of consortium.  The jury also awarded plaintiff $210,000.00 in medical

17

expenses, loss earnings and loss of earning capacity. In <u>Garrett</u>, a man was injured in an altercation with a police officer. After being stopped for a traffic violation, he was beaten and placed in handcuffs. Following the incident, he was examined by a physician who found him to have suffered contusions on the neck and back and spasms of the cervical region with a limited range of motion. The court found that plaintiff suffered an enormous amount of mental anguish as a result of this incident and saw a psychologist for over one year. Additionally, the plaintiff's psychologist diagnosed him as suffering with post-traumatic stress disorder and stated that she did not believe that he would recover from the effects of the incident.

<u>Brown v. Byer</u>, 870 F.2d 975 (5th Cir.) (TEX.), 04/24/89 (NO. 87-1323). In this matter the court awarded $55,000.00 in punitive damages against one deputy for his "wanton violation" of Brown's constitutional rights. Tammy Jean Brown sued civil defendants under 42 U.S.C. § 1983 and pendent state law theories, in order to recover damages for false arrest, false imprisonment, and two strip searches. The court found that the deputies' actions constituted a classic 4th Amendment violation; a decision to arrest an individual without a valid arrest warrant for that person and absent any circumstances that would justify such an arrest.

<u>Smith v. Wade</u>, 461 U.S. 30, 56; 103 S.Ct. 1625, 1640; 75 L.Ed. 2d 632 (1983). Punitive damages are available in § 1983 actions when the defendant's conduct "involves reckless or callous indifferent to the federally protected rights of others." Accordingly, as a general matter, punitive damages are available to remedy intentional or reckless violations of Civil Rights.

<u>Owen v. City of Independence</u>, Missouri, 445 U.S. 622, 651; 100 S.Ct. 1398, 1416; 63 L.Ed. 2d 673 (1980). Damage awards under § 1983 are "intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future Constitutional depravations as well." See also: <u>Thomas v. Frederick</u>, 766 F.2d 540, 559 (W.D.La. 1991). Generally, there are three types of

damages awardable; actual or compensatory damages, nominal damages, and punitive damages. Memphis Community School District v. Stachura, 477 U.S. 299, 306; 106 S.Ct. 2537, 2542-43; 91 L.Ed.2d 249 (1986).

A.    Compensatory Damages:

Compensatory damages awarded pursuant to § 1983 are governed by the common-law tort principles. Sockwell v. Phelps, 20 F.3d 187, 192 (5 Cir. 1994); Thompkins v. Belt, 828 F.2d 298; 301 (5 Cir. 1987). Compensatory damages should include both special damages such as medical expenses, loss of wages, and lost future earnings as well as general damages for pain and suffering and emotional and mental distress. The Fifth Circuit has continuously upheld jury awards of $100,000.00 for emotional distress. Forsyth v. City of Dollars, 91 F.3d 481 (5th Cir. 1996); *cert denied sub nom;* 522 U.S. 816; 118 S.Ct. 64 (1997). Wherein the court upheld a jury award of $100,000.00 in emotional anguish damages where the testimony was that the plaintiff suffered depression, weight loss, intestinal troubles, and marital problems in that she had to consult a psychologist. See also Williams v. Trader Publishing Company, 218 F.3d 481 (5 Cir. 2000).

The Fifth Circuit has upheld jury awards of $100,000.00 for emotional distress. See: Williams Trader Publishing Company, 218 F.3d 481 (5 Cir. 2000); Forsyth v. City of Dollars, 91 F.3d 769 (5 Cir. 1996); cert denied sub nom; 522 U.S. 816, 118 S.Ct. 64 (1997).

Moreover, the Fifth Circuit has held that the testimony of the plaintiff alone is enough to satisfy the requirement that specific evidence of the actual harm be introduced. Farpella-Crosby v. Horizon Health Care, 97 F.3d 803, 808 (5 Cir. 1996) (citing Carey v. Piphus, 435 U.S. 247; 98 S.Ct. 1042; 55 L.Ed.2d 252(1978)). See also: Midis v. Pearle Vision, Inc., 135 F.3d 1041, 1046 (5 Cir. 1998); Forsyth v. City of Dallas, 91 F.3d 769, 774 (5 Cir. 1996). Moreover, since compensatory damages for emotional distress are necessarily vague and are generally considered a fact issue for the trier or jury,

they may not be amenable to the kind of calculation disclosure contemplated by Rule 26(a)(1)(C).  See also Burrell v. Crown Central Petroleum, Inc., 177 S.R.D. 376, 386(EDTex 1997).  In both Forsyth and Williams, the Fifth Circuit upheld jury awards for $100,000.00 for emotional distress.  In Williams, the plaintiff testified that as a result of the discrimination, she suffered sleep loss, began smoking and a severe loss of weight.  Williams, at 486.  In Forsyth, the plaintiff testified that she suffered depression, weight loss, intestinal troubles and marital problems, and that she had been sent home because of her depression and that she had to consult a psychologist.  Forsyth, at 774.

     B.    Punitive Damages:

Punitive damages are allowed in appropriate cases under 42 U.S.C. § 1983.  City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 267-68; 101 S.Ct. 2748, 2760; 69 L.Ed.2d 616 (1981); McCulloch v. Glasgow, 620 F.2d 47 (5 Cir. 1980); Hall v. St. Helena, 95 0787 (La.App. 1 Cir. 6/28/96); 687 So.2d 1013, 1036, Parish Sheriff's Department; 668 F.Supp. 535, 540 (M.D.La. 1987), affirmed; 862 F.2d 872 (5 Cir. 1988).  Moreover, a plaintiff may recover punitive damages under § 1983 against a defendant and his *individual* capacity if the defendant's "conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  Smith v. Wade, 461 U.S. 30, 56; 103 S.Ct. 1625, 1640; 75 L.Ed.2d 632 (1983); Sockwell v. Phelps, 20 F.3d at 192; Thompkins v. Belt, 828 F.2d at 301-02; Lewis v. Goodie; 798 F.Supp. at 388.

Ortetgo v. Landry, 98-1948 (La. App. 3 Cir. 8/11/99) 746, So.2d 613.  The court found that an award of $60,000.00 for punitive damages against one of the deputy sheriffs was not abusively high given the fact that the plaintiff was physically manhandled, arrested, and brought to jail, all resulting from the deputy's abuse of official power.  Additionally, the award of $150,000.00 in punitive damages against the sheriff was supported by evidence specifically when it can be shown that the conduct was

20

motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.

C.    Attorney's Fees and Expenses:

The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, provides that courts may award reasonable attorney fees to a prevailing party in a 1983 action. Sockwell v. Phelps, 20 F.3d at 192; Cobb v. Miller, 818 F.2d 1227, 1230 (5 Cir. 1987); Kirchberg v. Feenstra, 708 F.2d 991, 995 (5 Cir. 1983); Watson v. Nile, 591 So.2d 1343, 1344 (La.App. 1 Cir. 1991). The purpose of the statutory provision for awarding attorney's fees in civil rights cases is to ensure effective access to the judicial process for persons with such grievances. Blanchard v. Bergeron, 893 F.2d 87, 89 (5 Cir. 1990). Attorney's fees may be recovered, unless special circumstances render such an award unjust. Stockwell v. Phelps, 20 F.3d at 193; Watson v. Nile, 591 So.2d at 1344. The test for prevailing party status is whether the plaintiff prevailed on the central issue by acquiring the primary relief sought. Cobb v. Miller, 818 F.2d at 1230.

Additionally, pursuant to 42 U.S.C. § 1988, the trial court may award expenses. A plaintiff is entitled to recover all reasonable out-of-pocket expenses, including charges for photocopying, paralegal assistance, travel, and telephone charges under § 1988 fee awards because they are part of the costs normally charged to a fee-paying client. Associated Builders & Contractors of Louisiana, Inc. v. Orleans Parish School Board, 919 F.2d 374, 380 (5 Cir. 1990). Smith v. Ouachita Parish School Bd., 29, 873 (La. App. 2 Cir. 9/24/97); 702 So.2d 727; 122 Ed. Law Rep. 1069 (La. App. 2 Cir., Sep 24, 1997) (NO. 29,873-CA). writ denied; 97-2721 (La. 1/16/98); 706 So.2d 978 (La. Jan 16, 1998) (NO. 97-C-2721). In this matter, the Court of Appeal found that the trial court did not abuse its discretion in awarding the prevailing plaintiff $19,440.00 in attorney's fees pursuant to the Civil Rights Attorney's Fees Awards Act, despite the contention that the hourly rate of $135.00 was excessive in light of the

fact that the plaintiff had a contingency fee contract with the attorney. Moreover, while the existence of a contingency fee contract is a factor in determining the reasonableness of an attorney fee award, the mere fact that such contract exists does not impose a ceiling or cap on the amount of fees awarded.

## IV.    CONCLUSION

Ms. Scott was arrested at her residence on January 14, 1999 when the defendants forced their way into her home, without a warrant, proceeded to physically and violently commit a battery upon her. Thereafter, they arrested Ms. Scott on an alleged charge of violating a protective order which given the facts and circumstances known to the arresting officers, along with their training and experience, a reasonable deputy should have known that probable cause did not exist to arrest Ms. Scott. The deputies' actions constitute a classic Fourth Amendment violation, as they made a decision to arrest Ms. Scott without a warrant in her home without consent to enter her residence and absent any circumstances that a reasonable deputy would justify such an arrest. Their conduct could only be explained as shocking to the conscious as they clearly acted with reckless disregard of Ms. Scott's constitutional rights. As a result of the unconstitutional arrest and excessive force used by the deputies acting in concert with each other, she was physically and verbally assaulted, caused to be stripped searched in plain view, physically and mentally abused while in their control and continues to suffer physical and mental damages as a result therein. Although, the trier of fact must exercise discretion, weighing the nature of the defendants' conduct and the wisdom of pecuniary punishment along with the advisability of a deterrent in viewing the facts and circumstances presented herein, it is clear that they warrant the award of damages inclusive of those for physical pain and suffering, mental anguish, emotional and mental distress, as well as medical expenses, punitive damages, attorney's fees and expenses.

Respectfully submitted,

FAVRET, DEMAREST, RUSSO & LUTKEWITTE
A Professional Law Corporation

J. PAUL DEMAREST, No. 4855
ELIA DIAZ-YAEGER, No. 24635
1515 Poydras Street, Suite 1400
New Orleans, Louisiana 70112
Telephone: (504) 561-1006
Facsimile: (504) 523-0699

23

## CERTIFICATE OF SERVICE

I certify that a copy of the above and foregoing has been served on opposing counsel by depositing same in the U.S. mail, postage prepaid, this the 23rd day of January, 2001.

J. PAUL DEMAREST