

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

DEC 21 2001

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BARBARA ANN SCOTT PITRE                    CIVIL ACTION
a/k/a BARBARA ANN SCOTT

VERSUS                                     NUMBER: 00-0118

DEPUTY SHERIFF KIRK RODRIGUE, ET AL.       SECTION: "K"(5)

### ORDER AND REASONS

Plaintiff in the above-captioned matter, Barbara Scott Pitre, has instituted suit herein pursuant to 42 U.S.C. §1983 alleging a violation of her federally protected civil rights in connection with her arrest on January 14, 1999.  Named defendants herein are Craig Webre, Sheriff of the Parish of Lafourche, Deputy Sheriffs Kirk Rodrigue, J.P. DeGravelles and Jules Tarullo, employees of the Lafourche Parish Sheriff, and Coregis Insurance Company, the insurer of the prior named defendants.  Plaintiff has also asserted pendent state law claims arising out of the same facts.

At all relevant times, plaintiff was residing in a home with



DATE OF ENTRY

DEC 2 4 2001

Alvin Legendre in Thibodaux, Louisiana, which was owned by Norman Legendre, Alvin's father. Mr. Alvin Legendre, in connection with his divorce from Barbara Legendre, was subject to an injunction issued by the state district court with proper jurisdiction, prohibiting him, his agents and employees from harassing his former wife. See Legendre v. Legendre, No. 84602, Seventeenth Judicial District Court for the Parish of Lafourche. The former Mrs. Legendre had also been given use and occupancy of the family home in the state court proceedings.

On January 12, 1999, plaintiff and Alvin Legendre entered onto the exterior premises of his former matrimonial domicile for purposes of cutting the grass. There is no suggestion that Alvin Legendre or plaintiff, Barbara Pitre, did any damage to the property on January 12th or that they interacted with the former Mrs. Legendre at that time. In fact, it appears that she was not home when the lawn was mowed. However, when the former Mrs. Legendre found out that they had entered onto the premises, she reported the matter to the Sheriff's Office and lodged a complaint, voicing fear of her former husband.

It appears that at some time in the past, there had been episodes, not uncommon in domestic matters, where Alvin Legendre had entered the former family home without permission from Barbara

2

Legendre and/or perused through the contents of the exterior mail box without her knowledge. Prior complaints of harassment had been lodged by the former Mrs. Legendre against Alvin Legendre, involving hang-up telephone calls, flattened tires and missing outside lights, but these had not been of recent vintage. Indeed, the Legendre's had been physically separated for at least two years before divorce proceedings were filed and the injunction at issue was granted. Plaintiff, Barbara Pitre, had not had any contact with the former Mrs. Legendre between the time she separated from Alvin in 1996 and the incident on January 14th, 1999. Nor was she implicated in prior allegations of harassment.

On January 14th, Deputy Lauren Chaisson of the Lafourche Parish Sheriff's Office went to the Legendre residence following her investigation of the complaint made by Barbara Legendre regarding the grass-cutting incident. Chaisson issued a citation to Alvin Legendre for trespass, since he had violated the court order giving his former wife occupancy of the property. Chaisson testified that she tried to de-escalate the situation by explaining to Alvin Legendre that he had no right to go on the premises; however, Legendre vehemently disagreed, stating that his attorney had told him he could do so. Chaisson acknowledged that there was no basis upon which to issue a citation to plaintiff, Barbara Pitre, at that

3

point in time in connection with the grass-cutting incident.

On that same day, Mike Clement, now a retired Lafourche Parish Deputy and neighbor of Alvin Legendre, also spoke with him as a friend about the grass-cutting incident.   Clement told Alvin Legendre to stay away from Barbara's house and Alvin again reiterated that his lawyer had told him he could do as he had.  At that point, however, Alvin Legendre, a former Sheriff's Deputy himself, told Clement that "if he had to arrest him, don't come by himself."   This comment was related to Deputies DeGravelles and Rodrigue by Clement.  Plaintiff, Barbara Pitre, was not a party to this conversation and it is not contended that she issued any alleged threats herself.

On the evening of January 14th, plaintiff and Alvin Legendre went into Thibodaux to shop for groceries around 5:30 or 6:00 p.m. On the way home, according to Barbara Pitre, they discovered that they were driving behind Barbara Legendre.  When Barbara Legendre reached her driveway, she turned in but is alleged by Pitre to have stopped near the edge of the driveway, so close to the highway that Alvin could not ease his vehicle around hers.   Legendre disputes the accuracy of this, saying she had pulled all the way into her carport.

In any event, an incident of some sort occurred at the

4

intersection of Barbara Legendre's driveway and the public highway. According to plaintiff, Mrs. Legendre parked near the highway, got out of her car and started cursing and screaming at the vehicle she and Alvin were in.   Pitre claims that she did not lower her window or respond in kind.   Barbara Legendre, on the other hand, stated that she was near her carport, preparing to go inside her house, when Pitre rolled down her window and yelled at her words to the effect of "I'm coming after your f--ing ass for what you did".   Needless to say, the Sheriff's office was again called and a further complaint was lodged.

According to Barbara Legendre's testimony, Deputy Kirk Rodrigue came in response to her call and was shortly thereafter joined by Deputy J.P. DeGravelles.   Kirk Rodrigue, who is the cousin of Barbara Legendre's son-in-law, took her report of the incident and, according to Legendre, made a telephone call to his supervisor because he did not know if he could arrest either plaintiff or Alvin Legendre based upon the report. Barbara Legendre does not remember showing Kirk Rodrigue copies of her injunction or divorce papers nor does she remember his asking to see them.

For his part, Kirk Rodrigue testified that Legendre's initial call to the Sheriff's Office was directed to J.P. DeGravelles, who arrived first and was in charge of the investigation, and that he

5

advised DeGravelles he would be en route to Legendre's house when he heard the dispatch over his radio. DeGravelles took a statement from Barbara Legendre and then called his supervisor about the situation. Rodrigue did not see the divorce judgment or injunction from the court before they left Barbara Legendre's house. Deputy Tarullo was summoned to accompany Rodrigue and DeGravelles to the residence of Alvin Legendre. However, Rodrigue testified that no decision had yet been made when they left Barbara Legendre's residence to arrest either Alvin or Barbara Pitre.

J.P. DeGravelles testified that he responded to a Code 79, i.e., violation of a restraining order, on the day in question, arriving first at the residence of Barbara Legendre. Mrs. Legendre advised of the incident in the driveway which had just occurred and further made the officer aware of her restraining order which she showed him.

DeGravelles then made a telephone call to Major Bud Dill, since Alvin Legendre was a former police officer, and because he wanted to find out what had happened regarding an earlier complaint which Barbara Legendre had lodged. DeGravelles had spoken with Mike Clement who had relayed his own conversation with Legendre and the events between Deputy Chaisson and Alvin Legendre which had occurred earlier that same day. DeGravelles further knew that a

6

citation had been issued to Legendre by Chaisson and that Alvin had been told to stay away from Barbara.  DeGravelles also spoke with Keena Lewis, a Victim's Assistance Officer, who had been involved with attempting to obtain a protective order from the court on Mrs. Legendre's behalf earlier that same day, which the court had denied.  He did, however, learn from Keena Lewis that the Judge had stated that the injunction was still enforceable.

DeGravelles asked Mrs. Legendre for a copy of her paperwork and then called Jules Tarullo to join him and Rodrigue.  All three left for Alvin Legendre's residence; however, DeGravelles testified that he had not yet determined to arrest either plaintiff or Legendre at that point. Tarullo, on the other hand, testified that he was summoned to Barbara Legendre's house to be backup and to do transportation.  On cross examination, Tarullo stated that Kirk Rodrigue told him that two people were going to be picked up when he first arrived on the scene at Barbara Legendre's house.  He, himself, saw no court paperwork that evening before the arrest and further testified that plaintiff did not put up any resistance at the time of her arrest.

The Court finds that a decision to arrest both Alvin Legendre and Barbara Pitre had been made by J.P. DeGravelles at the point that he and the other two deputies left the house of Barbara

7

Legendre.  At that point in time, he had seen defendant's exhibit 5, the restraining order, and knew that Barbara Pitre was not a party thereto.  He had not seen any court document specifically restraining or enjoining Barbara Pitre in any manner because one did not exist.

No warrant was obtained for the arrest of either Barbara Pitre or Alvin Legendre before the officers went to the residence.  Nor was a search warrant obtained before the officers entered the house.  There were no exigent circumstances which prevented the officers from obtaining either such warrants. Instead the officers proceeded directly to the residence.  Here the testimony of the principals diverges.

At around 7:30 p.m. on January 14, 1999, Barbara Pitre testified that she heard a banging noise in the back of the residence. Then she heard someone with a key, i.e., Norman Legendre, opening the door. Norman Legendre, Alvin's father, shouted that there were some deputies there who wanted to speak with her and Alvin.  Both she and Alvin Legendre were in bed clothing.

According to plaintiff, Kirk Rodrigue told both her and Alvin that they were under arrest and that they had to put on clothing. The officers say Pitre and Legendre were arrested outside the house

where they had stepped upon request of the police. Plaintiff says the officers were in the house without a warrant or consent when the arrest occurred. Rodrigue is then alleged to have followed her from the kitchen of the house, telling her that she could not change her clothing unless he watched. For no reason which was articulated, plaintiff then contends that Rodrigue grabbed her by the side of her face under her jaw and that DeGravelles and Tarullo lifted her a foot off of the floor and pushed her against a door frame.

Alvin Legendre, returning from putting on his clothing, asked the officers to put plaintiff down because "she is not violent". Plaintiff then alleges that she fell to the floor in the hallway where this occurred with one leg to the back and one to the front. Significantly, plaintiff is 5'3" tall and weighed approximately 250 pounds when this is alleged to have occurred.

While Alvin Legendre corroborates plaintiff's version of events, the deputies do not concur. Deputy Tarullo denies that he was in the house at any point and Deputies Rodrigue and DeGravelles support his testimony. Both DeGravelles and Rodrigue testified that neither individual put up any resistance that night and deny that they manhandled Barbara Pitre. Both contend that Pitre was allowed to go into the bathroom to change her clothing but that

9

DeGravelles examined the bathroom before she was allowed to do so in order to look for anything which could be used as a weapon.

It is DeGravelles' and Rodrigue's contention that the two were arrested outside of the house.  The arrest was made when both Legendre and Pitre refused to talk with the officers.  The officers did not read them their Miranda rights.  The officers contend that they followed both into the house after the arrest had been made.

Plaintiff claims that Deputy Tarullo searched her before he placed her in the police vehicle for transport.  She contends in so doing that he touched her breasts and between her legs up to her vagina which she considered inappropriate.  Tarullo denies that he frisked plaintiff or touched her at any time.   Rather, he transported Alvin Legendre.

J.P. DeGravelles admits to transporting plaintiff and to frisking her. He stated that he did not touch her genital area but that he did touch her buttocks near one of her pockets.  According to DeGravelles, plaintiff was verbally belligerent and he handcuffed her because of her attitude.

Once at the jail, Barbara Pitre was booked and then placed in the women's portion of the Lafourche Parish Jail.  Prior to her admission, plaintiff was stripped and searched.  Brett Theriot, Warden of the jail on January 14th, 1999, testified that upon

10

admission to the facility, inmates are asked to bend over and spread their buttocks; females are additionally asked to lift their breasts for inspection.  Plaintiff contends that the female deputy doing this inspection physically touched her breasts to see that nothing was under them as well as made her turn around while unclothed and bend over.  Plaintiff further contends that a body cavity search was performed upon her by the deputy.  The Warden, however, testified that body cavity searches are not done without a search warrant but that matrons in the jail wear gloves and routinely search the anal area of inmates for contraband.

Plaintiff was released from the jail the following day at around 1:30 p.m.

Plaintiff's first cause of action is pursuant to 42 U.S.C. §1983 for false arrest.  A pendent state law claim is also made based upon the same facts.

Plaintiff was arrested pursuant to LSA-R.S. 14:79 for violating an injunction issued by a state district court in the divorce proceedings between Barbara and Alvin Legendre.  The relevant portion of that document reads as follows:

> ...IT IS FURTHER ORDERED that a preliminary
> injunction issue herein, directed to both
> Barbara Legendre and Alvin Legendre enjoining
> and prohibiting each of them, their agents, or
> their representatives from harassing or

11

> verbally abusing the other and from
> transferring, disposing of, alienating, or
> otherwise encumbering any of the assets of the
> community of assets and gain existing between
> the parties. ...

> JUDGMENT RENDERED in open court on September
> 8, 1998 and signed in Chambers on this 22nd day
> of September, 1998 at Thibodaux, Louisiana.

On December 14, 1998, the judgment of divorce between the parties

was rendered, perpetuating the above injunction "until further

orders of this court." At no point has defense counsel contended

that plaintiff could have been arrested based upon any other legal

theory than a violation of this court document.

LSA-R.S. 14:79 reads in pertinent part as follows:

> A. (1) Violation of protective orders is the
> willful disobedience of a preliminary or
> permanent injunction or protective order
> issued pursuant to R.S. 9:361 et seq., R.S.
> 9:372, R.S. 46:2131, et seq., ...Code of Civil
> Procedure Article 3604...**after a contradictory
> court hearing**, or the willful disobedience of
> a temporary restraining order or any ex parte
> protective order issued pursuant to R.S. 9:361
> et seq., R.S. 9:372, R.S. 46:2131 et seq.,...
> or Code of Civil Procedure Article 3604 **if the
> defendant has been given notice of the
> temporary restraining order or ex parte
> protective order by service of process as
> required by law.** ...

> E. Law enforcement officers shall use every
> reasonable means, including but not limited to
> immediate arrest of the violator, to enforce a
> preliminary or permanent injunction or
> protective order obtained pursuant to R.S.

12

> 9:361, R.S. 9:372, R.S. 46:2131 et seq., ...
> Code of Civil Procedure Article 3604... **after**
> **a contradictory court hearing**, or to enforce a
> temporary restraining order or ex parte
> protective order issued pursuant to R.S.
> 9:361, R.S. 9:372, R.S. 46:2131 et seq, ...
> Code of Civil Procedure Article 3604 ... **if**
> **the defendant has been given notice of the**
> **temporary restraining order or ex parte**
> **protective order by service of process as**
> **required by law.**

(Emphasis Added).

It is clear that Barbara Pitre was never a party to the proceedings between Alvin and Barbara Legendre.  She was never the subject of the injunction issued by the court which is quoted above.  Nor was she ever served by Barbara Legendre or her attorney with a copy of the above injunction.  As noted earlier, testimony revealed that plaintiff had no contact whatsoever with Barbara Legendre from 1996 when the parties separated to the date of this incident.  So it would appear there was no reason for her to be enjoined in that litigation.  But had Barbara Legendre wished to make her the subject of the injunction, Pitre could have been ruled into court and a contradictory proceeding held to determine if she should be subject to such an order.   None of this was done before Pitre was arrested and, therefore, the arrest was not in accord with the pre-requisites of state law as quoted above.

Defendants do not now contend that the arrest was carried out

13

after the requirements of the statute had been met.  However, pursuant to 42 U.S.C. §1983, defendants urge the defense of qualified immunity to absolve them of liability to plaintiff. Specifically, the deputies claim that they held a good faith belief that Barbara Pitre was acting as the agent or representative of Alvin Legendre in shouting obscenities at Barbara Legendre and that, because they understood the injunction quoted above to be enforceable, they felt justified in arresting Pitre.[1]/

However, at no time did the deputies address the issue of service or indicate that they made any effort to determine if Pitre had been served with the injunction as required by the statute they were enforcing.  They merely had a copy of the injunction quoted above but took no steps to determine whether the statute had been complied with vis-a-vis plaintiff who was clearly not named therein. Indeed, when the District Attorney examined the charges lodged against Pitre, they were immediately refused.

In order for plaintiff to recover for false arrest and imprisonment under Louisiana law, she must prove: 1) that she was arrested and detained against her will and 2) that such action was

---

[1]/ Alvin Legendre was arrested at the same time as Barbara Pitre and there is no suggestion that his arrest was inappropriate under the circumstances.

14

without a warrant or other statutory authority.  <u>Harrison v. State of Louisiana</u>, 721 So.2d 458, 461 (La. 1998); <u>Kyle v. City of New Orleans</u>, 353 So.2d 969, 971 (La. 1977).  Here, plaintiff clearly has met both prongs of the test as to her arrest under R.S. 14:79.

On the issue of the §1983 claim, defendant has correctly stated the law applicable to the issue of qualified immunity. First, the Court determines whether plaintiff has alleged a violation of a constitutional right.  <u>Wilson v. Layne</u>, 526 U.S. 603, 609, 119 S.Ct. 1692, 1696-97 (1999); <u>Conn v. Gabbert</u>, 526 U.S. 286, 290, 119 S.Ct. 1292, 1295 (1999). Second, the Court determines whether this right was clearly established at the time of the alleged violation.  <u>Id.</u>  Third, the Court determines whether a reasonable official would understand the correct action to be taken in the situation as dictated by pre-existing law. <u>Anderson v. Creighton</u>, 483 U.S. 635, 107 S.Ct. 3034 (1987).  In other words, the Court queries whether a reasonable officer would believe the arrest to be lawful, under clearly established law and the information the officer possessed at the time.  <u>Gibson v. Rich</u>, 44 F.3d 274, 276 (5th Cir. 1995).

The only issue herein is the third prong of the test.  The record reflects that at least one other officer on the same police force, i.e., Deputy Lauren Chaisson, knew there was no basis to

15

even cite plaintiff for the incident of cutting the grass, presumably because plaintiff was not a party to any injunction in the divorce proceedings. J.P. DeGravelles maintains, however, that he believed plaintiff had knowledge of the court's injunction and that the order covered agents and representatives of Alvin Legendre. He sticks by his decision today that he made a good arrest in part because of the policy of Sheriff Webre that officers are to take a pro-active stance regarding domestic violence issues. DeGravelles testified that there have been prior incidents in his jurisdiction where people have been injured or killed due to domestic disputes. Clearly, this was a consideration in his determination to separate the parties and inject harsh reality into the situation.

The record is silent as to the type of training officers are given in the academy as to the role service plays in enforcement of R.S. 14:79. DeGravelles has testified that he mistakenly believed he could arrest under this set of circumstances. It is DeGravelles who effected the arrest; the actions of the other two junior officers involved transportation after the arrest had been effected. Their actions are not implicated in what happened to plaintiff.

DeGravelles was clearly wrong in effecting an arrest for a

16

violation of R.S. 14:79 under these circumstances.  The Court finds that he had determined to arrest plaintiff and Alvin Legendre before the contingent of officers left Barbara Legendre's residence.  DeGravelles made no effort to determine who had been a party to the injunction proceedings before the state District Judge; nor did he ask any questions regarding who had been served with the injunction.

The state statute is quite clear in its language, as noted above, specifying how someone is placed under the mantle of its protection.  DeGravelles failed to inquire of anyone as to one basic element of the offense which he contends that plaintiff committed, i.e., whether the procedures of law had been complied with to enforce the injunction against her.  He did not receive erroneous information about whether she was a party to the court proceedings.  He received no information, simply because he did not attempt to ask Barbara Legendre, Alvin Legendre or Barbara Pitre anything about who were parties to the injunction hearings before the arrest was effected.

The Court is of the opinion that an officer effecting an arrest under a given statute has the professional obligation of knowing and understanding the elements of the crime defined in the statute under which he makes his arrest.  Such is necessary before

17

an officer can comfortably say that he believes probable cause

exists that someone has committed a crime.  <u>Brown v. Lyford</u>, 243

F.3d 185, 189-90 (5th Cir.), <u>cert</u>. <u>denied</u>, ____ U.S. _____, 122

S.Ct. 46 (2001); <u>Glenn v. City of Tyler</u>, 242 F.3d 307, 312-13 (5th

Cir. 2001).  For Pitre, being served with the injunction beforehand

was part of the probable cause needed to constitute an offense

under R.S. 14:79.  And on this issue, the officer made no attempt

to obtain any information whatsoever.

However, this finding does not end the Court's consideration

of the defense of qualified immunity.  A review of the testimony

provided by DeGravelles indicates the following relevant colloquy:

> Q.  So you didn't have an arrest warrant.
>     Did you have a search warrant?
> A.  No, I did not.
> Q.  Are you familiar with the notion of probable cause?
> A.  Yes.
> Q.  Did you make any determination of probable cause in
>     the arrest of Barbara Scott?
> R.  Yeah. I felt that she was in violation of the
>     restraining order.
> Q.  Can you articulate it for me?
> A.  Why did I feel the probable cause had happened?
> Q.  Yes.
> A.  She had in effect committed, I guess you could say,
>     a simple battery. The simple battery would place
>     her in violation. A simple assault, excuse me.  The
>     committing of a simple assault would place her in
>     violation of the restraining order.
> Q.  Was it on that basis that you effected an arrest?
> A.  Right.

LSA-R.S. 14:38 defines simple assault as "an assault committed

18

without a dangerous weapon." And assault is defined further in LSA-R.S. 14:36 as "an attempt to commit a battery, or **the intentional placing of another in reasonable apprehension of receiving a battery"**.

A review of the jurisprudence from the Louisiana state courts reveals that a reasonable police officer could reach the conclusion that there was probable cause in this instance to believe that the crime of simple assault had been committed.  The elements of that crime are : (1) an intent to scare, (2) conduct by the defendant of the sort to arouse a reasonable apprehension of bodily harm in the victim and (3) the resulting apprehension on the part of the victim. <u>State v. Blaise</u>, 504 So.2d 1092, 1094 (La. App. 5th Cir. 1987); <u>State in the Interest of Tatom</u>, 463 So.2d 35, 37 (La. App. 5th Cir. 1985).  Furthermore, in <u>State v. Roebuck</u>, 543 So.2d 573, 575 (La. App. 4th Cir. 1989), the court found that a defendant who cursed a police officer and stated that he would "kick" the officer's "ass" created probable cause for his arrest based upon simple assault.

In the case presently before the Court, DeGravelles had probable cause to believe that Pitre had committed a simple assault at the time he arrested her, whether he ultimately charged her with that offense or not.  He had a complaining witness in Barbara

19

Legendre who stated that Pitre had said she would "come after her"
for what she had done.  Legendre voiced fear for her safety and
exhibited emotional distress when the officers spoke with her and
Pitre was in the company of Alvin Legendre who had been warned
earlier to stay away from his former wife's residence.

The Court views this testimony by DeGravelles as establishing
that he believed he had probable cause and could likewise have
arrested plaintiff for simple assault.  Therefore, under Fifth
Circuit jurisprudence, he is entitled to qualified immunity to the
same extent as if charges had in fact been lodged under the assault
statute.

The Fifth Circuit has considered this situation in the past
and has determined that a police officer may not obtain qualified
immunity for an unconstitutional warrantless arrest by claiming
that he could have arrested the plaintiff for another offense
unless two conditions are satisfied, as follows:

> "First, the charged and uncharged offenses
> must be 'related'.  Second, the arresting
> officer must demonstrate that there was
> arguable probable cause to arrest the
> plaintiff for the uncharged related offense."

> Vance v. Nunnery, 137 F.3d 270, 273
> (5th Cir. 1998)(citing Pfannstiel v.
> City of Marion, 918 F.2d 1178 (5th
> Cir. 1990); Gassner v. City of
> Garland, 864 F.2d 394 (5th Cir.

20

1989); <u>Trejo v. Perez</u>, 693 F.2d 482
(5th Cir. 1982); <u>United States v.
Atkinson</u>, 450 F.2d 835 (5th Cir.
1971)).

The Fifth Circuit further clarified that there are basically
two settings in which the "related offense doctrine" may be
invoked.  First, in cases where the arresting officer has made such
an arrest based on conduct occurring in his presence, he is
entitled to qualified immunity so long as the charged and uncharged
offense for which there was arguable probable cause each arose or
stemmed from the observed conduct.  Second, in cases where the
arresting officer has made such an arrest based on "first hand
knowledge" of evidence "gained as the result of personal
investigation," the officer is entitled to qualified immunity so
long as the evidence providing arguable probable cause to make an
arrest for the uncharged offense also suggested that the charged
offense had been committed. <u>Vance</u>, 137 F.3d at 274.

Here, the Court opines that DeGravelles made a personal
investigation by interviewing Mrs. Legendre and verifying her fear
at the incident which had occurred.  The facts giving rise to the
simple assault and to DeGravelles' mistaken belief that there had
been a violation of R.S. 14:79 are identical.  Accordingly, the
second prong articulated hereinabove serves to clothe DeGravelles

21

with qualified immunity from liability for action which would otherwise be compensable under both federal and state law.

As to plaintiff's state law claim, the tort of false arrest requires malice as an essential element. <u>Morin v. Caire</u>, 77 F.3d 116, 122 (5th Cir. 1996). Malice may be inferred from a lack of probable cause, or from a finding that the defendant acted in reckless disregard of the other person's rights. <u>Miller v. East Baton Rouge Parish Sheriff's Department</u>, 511 So.2d 446, 453 (La. 1987).

Article 213 of the Louisiana Code of Criminal Procedure provides that an officer may arrest a citizen without an arrest warrant when he "has reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer." Here, as noted above, DeGravelles had reasonable cause to believe, after conducting an investigation, that plaintiff had committed a simple assault. He, therefore, had probable cause to arrest her, whether she was ultimately charged with this offense or not.

As noted by the Louisiana Supreme Court in <u>Gibson v. State</u>, 758 So.2d 782 (La.), <u>cert</u>. <u>denied</u>, 531 U.S. 1052, 121 S.Ct. 656 (2000):

> "...we note without hesitation that no police

22

> officer should fear that doing his duty in
> good faith will subject him to liability.    An
> officer satisfies his duty of good faith in
> making an arrest if the arrest is based on
> probable cause.    Probable cause exists when
> the facts and circumstances within the
> arresting officer's knowledge, and of which he
> has reasonable and trustworthy information,
> are sufficient to justify a man of average
> caution in the belief that the person to be
> arrested has committed or is committing an
> offense."
>
> Gibson, 758 So.2d at 788
> (citing Beck v. Ohio, 379 U.S.
> 89, 85 S.Ct. 223 (1964); Miller
> v. East Baton Rouge Parish
> Sheriff's Dep't, 511 So.2d 446,
> 452-53 (La. 1987); State v.
> Wilson, 467 So.2d 503 (La.
> 1985)).

The Court, therefore, finds that under state law there was

probable cause for plaintiff to be arrested for simple assault.

The fact that she was charged under another statute is immaterial

since the factual nexus under which she was charged is the same for

both simple assault and violation of the protective order.

Accordingly, the Court finds no malice in the action taken by

DeGravelles and therefore plaintiff's false arrest claim under

state law is also without merit.

The Court further finds that the location of the arrest is of

no moment.    If it occurred outside of the premises, the arrest is

permissible.    If it occurred inside of the residence, the police

23

gained access through permission of Norman Legendre who, according
to plaintiff's testimony, opened the door voluntarily for them. No
damage was done to the premises to support entry without consent.

Plaintiff next contends that her arrest was effected by use of
excessive force. Federal and state law are essentially the same as
to what constitutes the excessive use of force. Individuals have
an obligation to peaceably submit to a lawful arrest and police
officers may use reasonable force to effectuate a lawful arrest and
detention. <u>Kyle v. City of New Orleans</u>, 353 So.2d 969 (La. 1977).
Under state law, if officers use unreasonable or excessive force in
effectuating an arrest, they and their employers are liable for the
injuries that result. <u>Picou v. Terrebonne Parish Sheriff's Office</u>,
343 So.2d 306, 308 (La. App. 1st Cir.), <u>writ</u> <u>denied</u>, 345 So.2d 506
(La. 1977).

Whether force is reasonable depends upon the totality of the
circumstances. But a court will evaluate the officers' actions
against those of ordinary, prudent and reasonable men placed in the
same position as the officers and with the same knowledge as the
officers whose actions are questioned. To succeed on an excessive
force claim, a plaintiff bears the burden of showing: "'(1) an
injury (2) which resulted directly and only from the use of force
that was excessive to the need and (3) the force used was

24

objectively unreasonable.'" <u>Glenn v. City of Tyler</u>, 242 F.3d 307, 314 (5th Cir. 2001)(quoting <u>Goodson v. Corpus Christi</u>, 202 F.3d 730, 740 (5th Cir. 2000) and <u>Williams v. Bramer</u>, 180 F.3d 699, 703 (5th Cir. 1999)).

Several factors may be considered in determining if force, from either a state or federal law viewpoint, is reasonable. These include: 1) the extent of the injury suffered, 2) the need for the application of force, 3) the relationship between the need and the amount of force used, 4) the threat reasonably perceived by the responsible officials, and 5) any efforts made to temper the severity of a forceful response. <u>Hudson v. McMillian</u>, 962 F.2d 522, 523 (5th Cir. 1992)

In the testimony that was presented to the Court, the officers deny that plaintiff resisted arrest or that any abnormal force was utilized. For her part, plaintiff claims that, in a narrow hallway depicted in the exhibits introduced into evidence, she was lifted as much as one foot off of the floor by the officers and then unceremoniously dropped. Upon her fall, she alleges that she struck the floor with her legs splayed in an awkward and damaging fashion.

From a physical standpoint, the Court finds it hard to believe that this happened. The hallway in question was quite narrow,

making it virtually impossible for four people to interact at the same time which is what plaintiff contends. Further, no inside damage to the premises has been established. Additionally, plaintiff's weight was such that the Court does not believe she could have been lifted in the manner which she contends. Furthermore, the Court notes that plaintiff has no adequate medical evidence to support that she suffered harm which resulted directly and only from the use of force that was excessive to the need. Lastly, plaintiff failed to complain of injury when she arrived at the jail and, had injury been observed when she initially arrived there, she would have been routed immediately to the hospital by personnel rather than admitted into the facility.

Plaintiff's orthopedic/neurologic medical records largely commence in late June, 1999, a good five months post the date she contends she was injured. Further, the doctors who examined her have difficulty finding an objective basis for her various complaints. Plaintiff attempts to explain her delay in receiving treatment in that she had no transportation. The Court, however, finds that, if plaintiff were suffering pain at the level of severity which she claims, she would have found a way to access medical assistance much more quickly.

In short, the plaintiff has not met her burden of proof on the

26

issue of whether excessive force was utilized against her. As in all civil suits, plaintiff maintains the burden of establishing each and every element of her cause of action by a preponderance of the evidence. On this claim, the Court does not believe that the officers utilized excessive force and, therefore, even if she could have established an injury, that injury still would not be compensable.

Lastly, plaintiff has alleged that she was strip searched at the jail when she was admitted. This occurrence does not seem to be at issue. Warden Theriot testified that body cavity searches are not performed at the jail. Rather, these are done by a physician following receipt of a court order authorizing same. However, inmates, including women, are asked to bend over and a search of their anal area is performed. Females are also asked to lift their breasts so that officers can verify that contraband is not present. Individuals entering population are de-loused. Female matrons deal with female inmates on these issues but, obviously, inmates are not clothed when these inspections go forward. The matron who performed the strip search on plaintiff was not named a defendant herein.

On October 18, 2000 (Rec. doc. 27), the Court granted a motion for summary judgment dismissing all federal claims against Sheriff

Webre.    A review of that motion reveals that the thrust of the claims which defendants sought to have dismissed did not deal with the strip search, although it was mentioned in a tangential fashion.    Plaintiff's opposition to the motion failed to request that the strip search claim be carved out from the claims being dismissed.    Accordingly, the Court's order dismissed all federal claims in this litigation against the Sheriff.    Plaintiff has never sought an amendment of that order pursuant to Rule 54(b), Fed.R.Civ.Pro. Nor has plaintiff questioned in post-trial pleadings that this claim should not have been dismissed, even after defendants noted the court's ruling on the motion for summary judgment.

That being the case, there is only a state law claim remaining for which the Sheriff might be responsible under a theory of respondeat superior if one of his employees violated the rights of the plaintiff.    The evidence which the Court heard in the Warden's testimony indicates that strip searches are routinely conducted at the jail. So it would appear that this is not an isolated instance of its being done.    Further, the inference is clear that strip searches are routinely performed with both the knowledge and at the direction of supervisory staff, i.e., the Warden and the Sheriff.

Jail officials may strip search a person arrested for a minor

28

offense and detained pending the posting of bond only if they possess a reasonable suspicion that he/she is hiding weapons or contraband. Watt v. City of Richardson Police Department, 849 F.2d 195, 197 (5th Cir. 1988). A reasonable suspicion may arise from factors such as "the nature of the offense, the arrestee's appearance and conduct, and the prior arrest record." Id. (quoting Giles v. Ackerman, 746 F.2d 614, 617 (9th Cir. 1984), cert. denied, 471 U.S. 1053, 105 S.Ct. 2114 (1985)). A strip search is permissible only if the official has an individualized suspicion that the arrestee is hiding weapons or contraband. This suspicion must relate to the individual arrestee and not to a category of offenders and does not merely arise because an arrestee fails to post bond immediately and police move him/her to general population. Kelly v. Foti, 77 F.3d 819, 822 (5th Cir. 1996); Weber v. Dell, 804 F.2d 796, 801-802 (2nd Cir. 1986), cert. denied, 483 U.S. 1020, 107 S.Ct. 3263 (1987).

In this case, plaintiff had no prior police record of any nature and she was being arrested for a misdemeanor offense. Sheriff's deputies supervised the procedure whereby she dressed herself at home prior to being brought to the jail. Deputies checked the area in plaintiff's home where she changed clothes, specifically to assure themselves that she did not have access to

29

dangerous weaponry prior to her being transported.    In short, defendants offer no suggestion of what would constitute individualized suspicion that plaintiff might have been hiding weapons to justify the conduct of a strip search.

As noted earlier, the Court opines that plaintiff has failed to prove her claim for excessive force.    Therefore, all medical bills associated with orthopedic or neurological treatment or consultation will be disallowed.

The record does, however, establish that plaintiff has suffered pain and suffering as well as mental anguish in connection with her strip search at the jail following her arrest.    Plaintiff commenced treating with Dr. Joseph Palotta on May 14, 1999. Initially, she saw Dr. Palotta on a weekly basis until mid July, 1999 when she began seeing him every two weeks.    That continued until mid November, 1999 when she began seeing the doctor every month.    She failed to consult with the doctor from May, 1999 until September, 1999 when she again began seeing him on a monthly basis. Plaintiff has incurred bills to Dr. Joseph Palotta for psychiatric treatment to the date of trial in the amount of Two Thousand Six Hundred Forty and 00/100 ($2,640.00) Dollars which the Court will order be reimbursed to her.

Dr. Palotta further testified that plaintiff is not improving

30

the way he would like her to because she reports being in pain and pain exacerbates depression. He further testified that plaintiff may settle down somewhat after her legal problems are resolved. Whatever the cause of plaintiff's physical pain, the Court has found that these defendants are not responsible for it. Throughout Dr. Palotta's interaction with plaintiff, she has complained of pain in addition to more traditional psychiatric symptoms such as nightmares, flashbacks and anxiety.

In assessing plaintiff's damages, it is impossible to separate those arising from her arrest from those associated with the strip search. The Court therefore awards a totality in general damages to plaintiff of Twenty-Five Thousand and 00/100 ($25,000.00) Dollars together with the sums owed to Dr. Palotta for his treatment to the date of trial. For quantum pertaining to strip searches, see Watt, supra and Joan W. v. City of Chicago, 771 F.2d 1020 (7th Cir. 1985).

The court finds that plaintiff has not proven to a legally sufficient standard that future psychiatric problems which she might have are attributable to the events sued upon as opposed to some other problems on-going in plaintiff's life and declines to award future medical or future pain and suffering damages. The Court notes that plaintiff did not seek psychiatric help until some

31

four months after the incident in question and then at the referral of her attorney and the Court does not believe that plaintiff was a blank slate, so to speak, before January 14, 1999 for which only the Sheriff is responsible.

Although plaintiff has sought punitive damages, the Court declines to award them. Having found only a state law violation, there is no legal theory under which punitive damages are available.

There will therefore be judgment herein in favor of the plaintiff, Barbara Scott Pitre, and against defendants, Sheriff Craig Webre and Coregis Insurance Company, in the full and true sum of Twenty-Seven Thousand Six Hundred Forty and 00/100 ($27,640.00) Dollars together with legal interest from date of judicial demand and all costs of these proceedings. As to all other defendants, the claims of plaintiff will be dismissed with prejudice.

New Orleans, Louisiana, this _20_ day of _December_, 200_1_.

_Alma L. Chasez_

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

32